The next matter on our calendar is Deutsche Bank Trust Company v. Rado Limited Partnership. We'll begin with Appellant. Counsel. Thank you, Your Honor. May it please the Court. My name is Mark Leimkuhler. I represent the Appellant Rado Limited Partnership. Rado is appealing the District Court's dismissal of its counterclaims against Deutsche Bank and the Court's entry of summary judgment for Deutsche Bank on its contract claim against Rado. The lawsuit deals with one aspect of a massive Ponzi scheme operated by the principles of an organization called Biscayne Capital. This scheme stole millions of dollars from investors, including Rado, and Deutsche Bank worked closely with the Biscayne schemers, and its conduct substantially aided the scheme, causing millions in losses to Rado and the Romet family whose trust assets Rado had developed. You're suggesting that Deutsche Bank was a co-conspirator? We do not allege co-conspiracy, Your Honor, but we do allege aiding and abetting. And if I could turn to the facts which established that on the motion to dismiss record as well as on the summary judgment record, the facts are these, that Rado opened an investment account with Deutsche Bank that held trust assets, and Deutsche Bank knew that. It knew that the account held trust assets and that it was managed by a supposed fiduciary named Fernando Haberer, who turned out to be one of the schemers. And having accepted that account, Deutsche Bank was confronted by information that clearly would have raised suspicions in any banker that Haberer, the fiduciary, was stripping the account of genuine assets and replacing them with worthless, unmarketable junk. But Deutsche Bank did nothing about it, and it allowed all the account assets to be stolen. Haberer was Rado's guy, right? Rado had given him a power of attorney? Rado had given Haberer a limited power of attorney. Well, he had the right to buy and sell, didn't he? Had the right to buy and sell within the trust account? He had the right to buy and sell within the account, Your Honor. However, Deutsche Bank was in a position, based on its relation with Biscayne, of whom Haberer was an employee and an agent, it was in a position where it saw that Haberer was switching out valuable assets for new to be junked because of its relationship with the Biscayne schemers who were peddling these assets. And our briefs provide the litany of facts, but I want to focus on the most striking, Your Honors, if I could. And this occurred in late 2017 and into early 2018, when Haberer ordered nine separate sales of these bogus notes that he had dumped into Rado's account. And each one of those transactions, each one of those attempted sales, failed. And that series of failed sales would have confirmed to any banker, and we submit it confirmed to Deutsche Bank, that there was no market for these notes and that they were unsellable, worthless junk. But... How would Deutsche Bank have known all of that? Deutsche Bank knew that a number of the notes that Haberer had been putting into the account were the subject of SEC action, where the SEC found that those notes had been peddled with material non-disclosures about the failing nature of the project that it was supporting. Deutsche Bank had a close relationship with Biscayne. Deutsche Bank held the accounts for the issuers of those securities. It was in... It had a bird's eye view of this scheme. And so, after these nine sales failed, Haberer comes back to Deutsche Bank and says, I want to buy more of this garbage, five and a half million dollars of this garbage, for the Rado account. And there's no money in the Rado account. I want to finance that purchase with sales of the other junk that's already in the account and that I tried to sell nine times before and could not. This is a flashing red light to any responsible, any reasonable banker. So, what did Deutsche Bank do? It let the transaction go through. The purchase was consummated. Of course, anyone would want to sell its own, its own junk into the account. But the sale, the sale that was supposed to finance the purchase, it failed. Of course, it failed because it had failed because these same types of notes had failed in their sales nine times previously. So, what did Deutsche Bank do there? Did it cancel the trade? No. It covered the overdraft to the tune of five and a half million dollars with the net effect that Haberer and his cronies walked off with five and a half million dollars in cash and Rado got worthless junk and a bill for the overdraft. When do you think the duty of Deutsche Bank to stop this transaction arose? What was the moment? Well, Your Honor, the moment, in my view, happened long before this. But it certainly happened when those, at the time, those prior transactions had failed. But there, as I said, there is a litany of information that Deutsche Bank had. When did a duty of care, to use the tort phraseology, when did that arise for Deutsche Bank? I hesitate to call it a duty of care, Your Honor. Under the case law, it's a duty of inquiry. A murder duty is a duty of inquiry, and that inquiry arose at least before the transactions where Haberer purchased the five and a half million dollars of notes without money in the account to cover it. And what triggered, what triggered it? What triggered it was a long succession, a long series of suspicious transactions in the account, the nine failed sales, the knowledge that Deutsche Bank had because of its very close relationship with Biscayne, that they were trading in notes that had already been cited by the SEC as being sold as part of an illegal scheme, that even though the principles of that scheme had been banned from the industry, that they were continuing to sell. Didn't the custody agreement say that Rado was solely responsible for its own trading activity and that Deutsche Bank was not responsible for the suitability of any investment? The account agreement does say that. But the account agreement... Why doesn't that language preclude your arguments? It doesn't, Your Honor, because that relates to investment activity. What Haberer was doing was not an investment strategy. It wasn't investment activity. It was theft. No other word to describe it. It was theft. And Deutsche Bank, as a custodian, does not have the right under its contract with Rado or under Lerner to essentially turn its eyes while the thieves are cracking the safe. In a more low-tech world, that would be the analogy that Deutsche Bank was the custodian of the vault. And it walked out the door while the thieves were there cracking the safe and walking out with the bags of money. That's what happened in this case. The keep and protect language of the contract required Rado to... Sorry, required Deutsche Bank to keep and protect Rado's assets as it would its own. And there is absolutely no doubt that if Deutsche Bank has seen its own manager handling Deutsche Bank's own money in this way or its own assets, it would have stepped in, it would have investigated, and it would have stopped it. It had promised Rado it would do the same thing here separately. The law required it, but it didn't. And that's the basis of the counterclaims that Deutsche Bank asserted. It's the basis of its defense to the contract claim that Deutsche Bank had asserted against it. But the district court refused to apply any meaning to the keep and protect language in the contract in violation of this court's decision in LaSalle Bank. Your time has expired, but you've reserved two minutes for rebuttal. I have your room. Thank you. We'll hear from Deutsche Bank. Good morning. May it please the court. I am David Januszewski from Cahill Gordon, the plaintiff appellee, Deutsche Bank Trust Company, Americas. I was also counsel below. I would respectfully submit that Rado's arguments on appeal all rest on a false premise that this was a trust account. I didn't hear much about that from my friend's opening. That is the real thrust of this appeal, that this was a trust account and that the fact that it was a trust account triggered duties of inquiry. Because this court has been very clear that outside the context of trust accounts, fiduciary accounts, escrow accounts, there is no duty of inquiry. This was a custodial account governed by the contract, the Worldwide Custody Account Agreement. That agreement in painstaking detail walks through the terms and conditions of the relationship. The duty to keep and protect that you've heard about, Deutsche Bank had that obligation and it had an obligation to execute transfers of the property pursuant to authorized instructions from Rado. There's no dispute here that Mr. Haberer was an authorized representative and that his instructions were to be followed under the terms of the agreement. So let's talk about the custody account and my friend on the other side uses the analogy of a vault. So I'll follow up on that. Imagine that you have an account holder has 10 bars of gold. And under this agreement, they send it to the vault, Deutsche Bank puts it in the vault. They say, we will keep it and protect it in our vault. It's the same vault we use for our own property and we will keep it here safe. The account holder has the ability to send instructions, say, hey, take one of my gold bars and deliver it to the gold dealer down the street because I want to sell that gold bar. Our job is not to stop and say, wait a second, do you really want to be selling gold right now? Do you really know this gold dealer that you want us to send it to? Our job is to follow the authorized instructions. In this case, they actually called the person to confirm these transfers were what was desired and to execute. Same thing as if it was stock, if there were 10 shares of Apple stock in the account, we'll keep it, we'll protect it, we'll keep it in our vault. But if your authorized representative contacts us pursuant to the I want to send the 10 shares of my Apple stock to my broker because I want to sell it and I want to buy Google. That's what we do. Again, we don't stop and say, do you really want to sell Apple at this time? Or Google's really a risky bet. That's what happened here. These were illiquid notes, to be sure. But Haberer was the authorized investment advisor for Rado and issued these notes. The fact that there was an overdraft, Rado tries to characterize this as if it was a loan. Imagine your checking account, you write some checks, make some electronic transfers, you deposit a check with your iPhone, you can even do now. All these things happen and you're in an overdraft situation. The bank calls you and says, hey, you got to put some money in the and the contract specifically contemplated that overdraft situations might occur. And that Rado would be obligated under the contract to promptly fill that hole. And that's what they haven't done to the tune of two and a half million dollars. They characterize it as a trust account based on the fact that way in the background, Rado is a limited partnership organized in New Zealand. It's not a trust. Who owns Rado? There's two corporations. There's another partnership. And somewhere behind this complex structure, apparently there are trust funds. But that does not make this account open pursuant to this contract, a trust account. It just doesn't. And what they're asking- Did a different duty arise when Mr. Haberer had to finance the last sale? And they had to approve that, the financing? Was that a different level of care required than when he was just selling things they already had? I don't think so, Your Honor, because again, the financing is their characterization. What happened was instructions for a simultaneous purchase and sale of notes. It was not the expectation that there would be something to finance. The expectation was that the sale and the purchase would offset. If you do the math, it's almost to the dollar of the expectation. So these transfers would occur and it would be a net zero in terms of the account balance because it would balance out. Much like I said, if you write a check for $100 and you go deposit a $100 check, that's not a financing. And if it's overdrawn, again, it's the bank's problem, ultimately, as it is here. And should they have been more aggressive in pursuing Rado? They cut Rado some slack as a customer, to be sure, in terms of fixing the problem. How do you respond to the argument that the bank should have known that these notes were bad and that it did know that the notes were bad and that this was not on the up and up? There's no... My friend in his opening used a lot of generalities and characterizations. If you parse the complaint, there are no factual allegations that Deutsche Bank knew these notes were bad. There just aren't. He talks about this longstanding relationship with Biscayne. There's no allegation of that. There are certainly relationships, but Deutsche Bank has a lot of that was subject to this prior SEC order with the name Biscayne. Biscayne can mean a lot of things. Biscayne used to be a Chevrolet, I think. I don't know that Deutsche Bank... I know that Deutsche Bank was not obligated under this contract to do due diligence on the investment advisor or the did review the complaint carefully. There is just no allegation, factual allegation that Deutsche Bank was on notice of what was going on here. Let me just add under this court's decision in, I think, most dramatically in Sharpe, where State Street, I think it was, was in a similar situation where they had suspicions that there might be as characterized, I think, by the complaint in that case, basically maneuvered to get itself out of harm's way in terms of loans and things like that. This court said, it may be unseemly. I think the judge may have even talked about morality, but it's permitted. State Street, in that case, had a duty to its shareholders to extricate itself from that situation. I'm not saying that's this case because it's not. Again, there's no such allegation that Deutsche Bank was on notice. The record is clear that when this deficit was there, they saw it as a problem and they took steps to fix it, which Rado ignored. Again, they criticized us. You should have reached out to the ultimate beneficiary of the trust. That's not how it works. You have an account agreement. It says who the people up who are authorized are, and you don't have a duty to figure out who's behind this carefully constructed scenario, which I can't speak to this case, but are often created to prevent people from figuring out who's back there. There was no duty to ring any alarms for the ultimate beneficiary. We certainly appreciate their frustration at the end of the day to have to fill this hole and write a check when they apparently have been victims of a Ponzi scheme. They're the victims of a Ponzi scheme because they trusted a family relative to manage their money. They're looking for somebody to help them. Unless there are any questions, we can rely on a brief. Thank you, counsel. Counsel for Rado, we reserve two minutes for Rado. Thank you, Your Honor. Mr. John Whiskey said that Deutsche Bank fully expected there to be money from the offset to pay for that purchase. First of all, that's an inference that's being drawn against Rado, which is not permissible in the procedural posture of the case below, which is motion to dismiss and motion for summary judgment. Even if you were to indulge that inference, I'm old enough to remember Paul Harvey when I was younger. While the story that I told up to this point is bad enough, there is still a rest of the story. The rest of the story is that a week later, after that first corresponding buy-sell order, the buy succeeded and the sale did not, Haber went back to Deutsche Bank and said, I want to buy $7 million more of the same kind of garbage that I've been buying all this time. I'm going to finance it again with proceeds that I'm going to get from the sale of other worthless junk. If Deutsche Bank wasn't on notice by then, it's a different reality than I'm used to and certainly a different reality than how any banker that I know would have responded to it. Deutsche Bank did not inquire. Deutsche Bank did not put its hand up and say, stop, let me look into this. Deutsche Bank let the transaction go through and then funded the overdraft so that Haber and his cronies walked off with another $7 million in cash, knowing that it was going to point the finger at Rado if the money didn't come in eventually. What specifically gave rise to the duty to inquire in the scenario as you have just laid it out? How did Deutsche Bank know? Deutsche Bank knew that Haber had been dealing in the same notes that had been the subject of an SEC order, identifying them as part of an illegal scheme. Haber, Deutsche Bank knew that these notes had tried, that Haber had tried to sell notes out of the account and had failed to do so on nine occasions and by the second overdraft, by even more, by ten occasions. It knew that Haber was using these accounts, was using the accounts to funnel money to his cronies into a Ponzi scheme. Are those allegations in the complaint? Counsel says that they're not. Well, Your Honor, they are, the judge, Judge Cote considered on the motion to dismiss allegations in the complaint, documents and other information that were available to the claimant. And my question was, these factual allegations that you have just made, are they in the complaint? A number of the failed sales are identified in the complaint and Judge Cote allowed the parties to incorporate more information. And there was a declaration by counsel below, which identified other failed sales. And then on summary judgment, the record was even fuller, although not as full as it could have been because Judge Cote did not allow the parties to take any discovery. So this information was before Judge Cote, when she ruled on the motion to dismiss, when she ruled on motion for reconsideration, and it was even a more fulsome record when she ruled on summary judgment. The other point I want to make is that my friend on the other side had pointed out Judge Cote's view that the account was not Lerner, and we've explained this in our brief, so I won't belabor this here, but Lerner makes it clear that the label on the account is not what matters. What matters is that the bank knows that it's holding trust assets, which is what was alleged here and what Deutsche Bank indisputably knew. But... Trust assets in what sense? I'm sorry, Your Honor? Trust assets in what sense? It's not a trust that the bank is monitoring or is holding. They're not your trust officer. Exactly. It is precisely not the circumstance where it is a trust that is being managed... Administered by... Right. Someone else is the fiduciary. And that was the circumstances of Lerner. And Lerner found that it was alleged to have been a trust, to be holding trust assets, and even though it was not denominated as a trust account, the Lerner court accepted that these were trust assets that were subject to the Lerner duty. Even if Lerner doesn't apply, and it does, but even if it does, the issue of whether or not it's a trust account or trust assets, it doesn't matter to the account agreement, where Deutsche Bank promised Rado, regardless of what label was on the account or what type of assets were in the account, it was going to keep and protect them as it would its own assets. And it didn't do that. So, it is a trust account subject to Lerner because it holds trust assets, and that's what Lerner cares about. But even apart from that, the keep and protect obligation, what we call the golden rule, required Deutsche Bank to take action. It was not to monitor the information. When information came to it saying bad things are happening in this account, this account being operated by a fiduciary, it had a duty to inquire. A very modest duty, but one that it still didn't fulfill. Thank you, counsel. Your time has long expired. We'll reserve decision. Thank you both.